# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

| | | |
|---|---|---|
| BASIL M. HANTASH, | § | |
| | § | |
| *Plaintiff*, | § | |
| | § | |
| v. | § | |
| | § | |
| JAMES WILLIAM BYRD, JOSHUA | § | Civil Action No. 24-2392 |
| MATTHEW WEARMOUTH, KEVIN | § | |
| ROBERT GILLESPIE, WALDON | § | |
| FENSTER, DANIEL FERNANDES ROJO | § | |
| FILHO, HERIBERTO CANDELARIO | § | Jury Trial Demanded |
| PEREZ VALDES, DEAL EXCHANGE, | § | |
| LLC, SOTERIA GROUP, LLC, and | § | |
| NORDIC TRUST ALLIANCE KB, LLC, | § | |
| | § | |
| *Defendants*. | § | |

## ORIGINAL COMPLAINT

Plaintiff Dr. Basil M. Hantash ("Plaintiff" or "Hantash") files this Original Complaint against Defendants James William Byrd, Joshua Matthew Wearmouth, Kevin Robert Gillespie, Waldon Fenster, Daniel Fernandes Rojo Filho, Heriberto Candelario Perez Valdes, Deal Exchange, LLC, Soteria Group, LLC, and Nordic Trust Alliance KB, LLC (collectively, "Defendants"), and alleges as follows:

## SUMMARY OF THE ACTION

1.     Defendants are members of a criminal enterprise engaged exclusively in defrauding individuals out of their hard-earned money through a variety of investment scams. In 2023, Defendants James Willia Byrd, Joshua Wearmouth, and their accomplices, directly and through Velanos Principal Capital Inc. ("Velanos"), an entity Mr. Byrd and Mr. Wearmouth control, defrauded Plaintiff Hantash out of $4 million using an illegal scheme commonly referred to as a "prime bank" or "advanced-fee" fraud.

2.      Defendants represented to Dr. Hantash, verbally and in writing, that Velanos could procure one or more standby letters of credit ("SBLC"), which Velanos would then sell at a significant profit in pre-arranged trades. The profit from that sale would then be used to purchase additional SBLCs that would again be sold in pre-arranged trades at additional significant profit.

3.      Byrd and Wearmouth told Dr. Hantash he needed to front the cash to purchase the SBLCs. For their efforts, Dr. Hantash and Velanos would both experience incredible returns from their investments in a short period of time. Defendants represented to Dr. Hantash that the SBLC investment presented absolutely no risk of loss to Dr. Hantash's capital contribution.

4.      Based on these representations, Dr. Hantash invested a total of $4 million in a joint venture with Velanos. Mr. Byrd, Mr. Wearmouth, and their accomplices informed Dr. Hantash that his capital would generate a return of $20 million, including his original capital contribution, within 90 days.

5.      To keep the scheme going and to forestall legal action against them, Defendants falsely represented to Dr. Hantash that the investment was successful and that payments of the proceeds to Dr. Hantash were imminent and/or had already been made. Defendants even created a fake bank, fake bank websites, fake wire confirmations, and other detailed falsehoods to mislead Dr. Hantash while absconding with his money.

6.      In truth, Defendants never obtained SBLCs with Dr. Hantash's capital, never earned the promised returns in a trading program, never paid any profits to Dr. Hantash, and never intended to do so. They stole his money.

## JURISDICTION

7.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 in that this is a civil action arising under 18 U.S.C. §§ 1961 *et seq.*, the Racketeer Influenced and Corrupt Organizations Act ("RICO").

8.     This Court also has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(1) because the amount in controversy exceeds $75,000, exclusive of interest and costs, and because Plaintiff and Defendants share no common citizenship.

9.     This Court has supplemental jurisdiction over the state-law claims in this action pursuant to 28 U.S.C. § 1367 because the state-law claims arise from the same case or controversy as the claims over which this Court has original jurisdiction.

10.     This Court has personal jurisdiction over Mr. Byrd because he is domiciled in the state of Texas.

11.     Pursuant to 18 U.S.C. § 1964, this Court has personal jurisdiction over all other Defendants because this Court has personal jurisdiction over Mr. Byrd and the ends of justice require that other parties residing in any other district be brought before the Court.

## VENUE

12.     Venue is proper in this district under 28 U.S.C. § 1391(b)(1) because this is the judicial district in which Mr. Byrd resides.

13.     Pursuant to 18 U.S.C. § 1965, venue is proper in this district as to the defendants residing outside of this judicial district because venue is proper for Mr. Byrd and the ends of justice require that all other parties residing in any other district be brought before the Court.

## PARTIES AND RELEVANT NON-PARTIES

14.     Plaintiff Dr. Basil M. Hantash is an individual who resides in San Juan, Puerto Rico. Plaintiff is a citizen of Puerto Rico.

## I.    DEFENDANTS.

15.     Defendant James William Byrd (a/k/a Wilbur Byrd a/k/a Will Byrd) is an individual who resides in Dallas, Texas and may be served with process at 5665 Arapaho Road, Unit 2828, Dallas, Texas 75248 or wherever he may be found. Mr. Byrd is a citizen of Texas.

16.    Defendant Waldon Fenster is an individual who resides in Downers Grove, Illinois and may be served with process at 4740 Saratoga Avenue, Downers Grove, Illinois 60515 or wherever he may be found. Mr. Fenster is a citizen of Illinois.

17.    Defendant Kevin Robert Gillespie is an individual who resides in Carpentersville, Illinois and may be served with process at 6625 Majestic Way, Carpentersville, Illinois 60110 or wherever he may be found. Mr. Gillespie is a citizen of Illinois.

18.    Defendant Joshua Matthew Wearmouth is an individual who resides in Newport Beach, California and may be served with process at 1226 Newberg Commons, San Jacinto, California 92582 or wherever he may be found. Mr. Wearmouth is a citizen of California.

19.    Defendant Daniel Fernandes Rojo Filho (a/k/a Danyel Fernandes) is an individual who resides in Clermont, Florida and may be served with process at 3211 Vineland Road, PMB 309, Kissimmee, Florida 34746 or wherever he may be found. Mr. Fernandes is a citizen of Florida.

20.    Defendant Heriberto Candelario Perez Valdes (a/k/a Eddie Perez) is an individual who resides in Miami Gardens, Florida and may be served with process at 18201 NW 32nd Avenue, Miami Gardens, Florida 33056 or wherever he may be found. Mr. Perez is a citizen of Florida.

21.    Defendant Deal Exchange, LLC is a Wyoming limited liability company with its principal office at 1718 Capitol Avenue, Cheyenne, Wyoming 82001. Deal Exchange, LLC may be served by and through its registered agent, Anderson Registered Agents, at 1716 Capitol Avenue, Suite 100, Cheyenne, Wyoming 82001. Deal Exchange, LLC is a citizen of Wyoming.

22.    Defendant Soteria Group, LLC is a Texas limited liability company with its principal office at 539 W. Commerce Street, Suite 5208, Dallas, Texas 75208. Soteria Group, LLC

may be served by and through its registered agent, Seth Hicks, at 539 W. Commerce Street, Suite 5208, Dallas, Texas 75208. Soteria Group, LLC is a citizen of Texas.

23.    Defendant Nordic Trust Alliance KB, LLC ("NTA") is a Florida limited liability company with its principal office at 121 S Orange Avenue, Suite 1500, Orlando, Florida 32801. Nordic Trust Alliance KB, LLC may be served by and through its registered agent, Ester G. Nascimento Ramos, at 3211 Vineland Road, PMB 309, Kissimmee, Florida 34746. Nordic Trust Alliance KB, LLC is a citizen of Florida.

## II.    RELEVANT NON-PARTIES.

24.    Velanos Principal Capital Inc. ("Velanos") is a Canadian corporation with its principal place of business at 120 Adelaid Street West, Suite 2500, Toronto, Ontario M5H 1T1, Canada. Velanos was the entity used by Defendants to purportedly invest Dr. Hantash's money in the SBLCs.

25.    Escape Therapeutics, Inc. is a California corporation. Escape Therapeutics was founded by Dr. Hantash and is the entity for which Dr. Hantash sought capital to fund its projects.

26.    John P. Ferrick is an individual who resides in Northbrook, Illinois. Mr. Ferrick is a member of Escape Therapeutics' Board and was tasked with seeking capital sources at Dr. Hantash's request.

27.    Kevin J. Cawley is an individual who resides in Downers Grove, Illinois. Mr. Cawley is a business associate of Mr. Ferrick and introduced Mr. Ferrick and Dr. Hantash to Deal Exchange.

28.    Martin Brian Tobias Gibbins (a/k/a Martin Gibbons) is an individual who resides in England. Mr. Gibbins is a purported banker with residences in both the United Kingdom and the United Arab Emirates. Mr. Gibbins served as an alleged reference for Velanos' investment strategy to coax Dr. Hantash into parting with his money.

29.    Jasotha Ulaganathan (a/k/a Jasotha Ulganathan) is Defendant Velanos Principal Capital Inc.'s purported banking officer. Jasotha Ulaganathan is located in Canada.

30.    Edward Koziel is NTA's purported compliance officer. Dr. Hantash attempted to contact Mr. Koziel regarding his issues with NTA's banking system via his listed email address and phone number.

31.    James A. Hutchinson is purportedly on the board of directors for Velanos. Dr. Hantash contacted Mr. Hutchinson regarding the status of his investment after he uncovered the criminal scheme.

32.    Lucia Harris (a/k/a Lucia De Faima Alves Do Couto a/k/a Lucia Alves) is and/or was on the board of directors for Velanos. Ms. Harris corresponded with Dr. Hantash regarding the status of his investment after he uncovered the criminal scheme.

## GENERAL ALLEGATIONS

33.    Dr. Hantash is the founder and Chief Executive Officer of Escape Therapeutics, Inc. Escape Therapeutics is an early-stage biotechnology company focused on accelerating the commercial availability of allogeneic stem cell therapies. Escape Therapeutics' technology seeks to revolutionize the treatment of numerous medical diseases that require cell and/or organ replacement such as type I diabetes, Parkinson's, leukemia, and more.

34.    In January 2023, Dr. Hantash sought project financing of approximately $20 million to fund commercial development of new biotechnologies with his company, Escape Therapeutics.

35.    Through mutual connections, Dr. Hantash was introduced to Mr. Fenster, who, in turn, introduced Dr. Hantash to Mr. Byrd, Mr. Wearmouth, and Mr. Gillespie. These individuals would turn out to be the main actors in a criminal enterprise designed to deprive wealthy investors of their hard-earned money and pad their own pockets.

36.     Both verbally and in writing, Mr. Byrd, Mr. Wearmouth, and Mr. Gillespie represented to Dr. Hantash that, through their investment entity, Velanos, they regularly raised millions of dollars in capital through financial instruments known as standby letters of credit ("SBLCs").

37.     Mr. Byrd, Mr. Wearmouth, and Mr. Gillespie had specialized experience, knowledge, and connections that allowed them to purchase SBLCs at a discount and immediately sell them at a large profit in pre-arranged transactions.

38.     Mr. Byrd, Mr. Wearmouth, and Mr. Gillespie proposed a joint venture between Dr. Hantash and Velanos whereby Velanos, using capital supplied by Dr. Hantash, would initiate a series of SBLC trades that would generate massive profits for Dr. Hantash and Velanos together.

39.     Over the course of a few months, Mr. Byrd, Mr. Wearmouth, and Mr. Gillespie slowly convinced Dr. Hantash of the investment's validity. They even assured Dr. Hantash that the SBLC investment posed no risk of loss to Dr. Hantash.

40.     Mr. Byrd, Mr. Wearmouth, and Mr. Gillespie assured Dr. Hantash that the SBLC investment would return Dr. Hantash's capital and distribute profits to Dr. Hantash of up to 500% of the principal investment within 90 days. By way of example, Dr. Hantash could raise the $20 million he needed for his research with only a $4 million principal investment in merely 90 days.

41.     To further convince Dr. Hantash to "invest" $4 million, Mr. Byrd, Mr. Wearmouth, and Mr. Gillespie introduced Dr. Hantash to a supposed Velanos investor named Martin Gibbins. Dr. Hantash spoke with Mr. Gibbins over the telephone. Mr. Gibbins spoke highly of Velanos and assured him that the Defendants' representations were all accurate.

42.    On or about April 12, 2023, Dr. Hantash and Velanos executed a Joint Venture Agreement ("JV Agreement") concerning the SBLC investment. Mr. Wearmouth executed the JV Agreement on behalf of Velanos.

43.    The JV Agreement required Dr. Hantash to contribute $4 million in capital to the joint venture, which Velanos would use to engage in its planned transactions involving SBLCs.

44.    Dr. Hantash's expectation under the JV Agreement is memorialized through the agreement itself and numerous emails and text messages between the individuals involved.

45.    Dr. Hantash never received any of the profits promised from the JV Agreement nor the return of his original capital contributions.

46.    To contribute the required $4 million to the joint venture, Dr. Hantash obtained a loan against securities in his brokerage account. In addition to never receiving his promised profits, Dr. Hantash incurred millions of dollars in losses pursuant to covering margin calls associated with the loan on his brokerage account.

47.    Since May 2023, Mr. Byrd, Mr. Wearmouth, and Mr. Gillespie have repeatedly and falsely represented certain transfers, returning multi-million dollar payments to Dr. Hantash, have occurred. This was, and remains, false.

48.    In June 2023, Dr. Hantash began raising concerns about the distributions he was owed under the JV Agreement. Dr. Hantash provided instructions for the first distribution to be wired to the same account listed in the JV Agreement as the original source of the funds contributed to the SBLC investment.

49.    Mr. Byrd, Mr. Wearmouth, and Mr. Gillespie informed Dr. Hantash that his money was safe and in an account at Nordic Trust Alliance ("NTA"), a supposedly U.S.-licensed bank. This would also prove to be false. Accordingly, Dr. Hantash also requested a personal checking

account be created for him at the NTA bank. Dr. Hantash completed the appropriate paperwork and an account was purportedly created for him with NTA.

50.     Dr. Hantash immediately attempted to initiate a transfer of his funds from the NTA account to his prior bank account from which the funds originated. The transfer was cancelled.

51.     After going back and forth with NTA's representative, NTA's website eventually reflected that the transfer had been executed. But no money was ever transferred to Dr. Hantash's account.

52.     Dr. Hantash sent multiple requests through NTA's online portal and via email about the status of its outgoing wire transfers. The only responses he received were non-substantive. Eventually, the NTA line of communication went silent.

53.     After Dr. Hantash's numerous emails and attempts to contact Mr. Byrd, Mr. Byrd ultimately admitted that NTA was not a U.S.-licensed bank, but instead a foreign bank. This also proved false.

54.     NTA was just another cog in the criminal enterprise orchestrated to steal Dr. Hantash's money.

55.     Dr. Hantash's reliance on these false statements and misrepresentations was reasonable given the lengths to which Defendants went to give their false statements and misrepresentations an air of legitimacy. At the time Dr. Hantash committed his capital to the SBLC investment, there was no reason to question the validity of the investment or any of the Defendants' statements about Velanos' ability and intention to distribute profits to Dr. Hantash and return his capital contributions.

56.     Dr. Hantash relied on Defendants' false statements and misrepresentations to his substantial detriment in that he was personally deprived of $4 million and his company, Escape

Therapeutics, was unable to raise the capital it needs to perform life-saving medical research and development.

## DETAILED ALLEGATIONS

57.    Beginning in at least July 2020, and continuing through at least March 2024, Defendants, and others known and unknown, were associated together in fact as an enterprise for the common purpose of enriching its members and associates, through the repeated commission of diverse criminal acts set forth below.

## GOAL AND PURPOSE

58.    The goal of this conspiracy and the purpose of the Defendants' criminal enterprise was to scam Dr. Hantash out of Four Million Dollars ($4,000,000) by taking advantage of Escape Therapeutics' need for financing to fund its lifesaving, industry-shaping research and instead line its members' and its associates' pockets through repeated commissions of criminal acts such as wire fraud, and more.

## ENTERPRISE

59.    Defendants' enterprise ("SBLC Syndicate") was itself not a legal entity, but an association in fact of persons, sometimes acting through legal entities at the direction of Mr. Byrd.

60.    Mr. Byrd knowingly, willfully, and with the requisite intent, induced Dr. Hantash to wire Velanos, a company under Mr. Byrd's control, $4 million. Mr. Byrd also knowingly, willfully, and with the requisite intent made repeated misrepresentations regarding the details alleged investment opportunity, the other people and entities involved in the investment, the expected outcome of the investment and more. By way of example, Mr. Byrd misrepresented to Dr. Hantash that there was zero downside risk to investing his money with Velanos. Mr. Byrd misrepresented that the investment existed in the first place and that such profits were realistic.

Mr. Byrd made these misrepresentations to Dr. Hantash with knowledge that Dr. Hantash needed a significant amount of money to fund his life-saving medical research.

61.    For most of the scheme, Mr. Byrd represented that he was the controlling party of Velanos, emailing consistently from a Velanos email address. Once Dr. Hantash began to ask questions and sent Velanos a notice of default under the JV Agreement, Mr. Byrd stated he was not a member of Velanos. This was contrary to everything Mr. Byrd had told Dr. Hantash previously. Thus, at a minimum, one of these statements was a blatant misrepresentation. Mr. Byrd also misrepresented that no investor would want to discuss their prior investments with Dr. Hantash. Nevertheless, Mr. Byrd eventually introduced Dr. Hantash to Mr. Gibbins, an alleged investor, to further induce Dr. Hantash to participate in the scheme. This statement was made to induce Dr. Hantash to invest without speaking to any prior investors. Mr. Byrd also misrepresented to Mr. Hantash that NTA was a licensed bank in the United States. Mr. Byrd made repeated misrepresentations to Dr. Hantash regarding the status of his investment, the profits to be obtained therefrom, the location of his funds, and the timeline of the alleged investment. Eventually, Mr. Byrd stopped responding to Dr. Hantash's inquires and questions because Dr. Hantash had already invested his $4 million. Mr. Byrd accomplished this goal through numerous phone calls, emails, text messages, and other forms of electronic communication. Mr. Byrd committed these acts and others to enrich himself and to Dr. Hantash's detriment.

62.    Mr. Wearmouth knowingly, willfully, and with the requisite intent, induced Dr. Hantash to wire Velanos, a company under Mr. Byrd's control, $4 million. As a member of Velanos, Mr. Wearmouth was instrumental in perpetrating the fraud and misrepresentations critical to the success of the SBLC Syndicate's scheme. Mr. Wearmouth also knowingly, willfully, and with the requisite intent made repeated misrepresentations regarding the details of the alleged investment

opportunity, the other people and entities involved in the investment, the expected outcome of the investment and more. Among examples others, Mr. Wearmouth misrepresented to Dr. Hantash that there was zero downside risk to investing his money with Velanos. Mr. Wearmouth also misrepresented that no investor would want to discuss their prior investments with Dr. Hantash. This statement was made to induce Dr. Hantash to invest without speaking to any prior investors. Nevertheless, Mr. Wearmouth assisted in arranging for Dr. Hantash to speak with Mr. Gibbins, an alleged previous investor with Velanos.  Mr. Wearmouth also misrepresented to Dr. Hantash that the per trade profit of the investment was approximately 55%. Eventually, Mr. Wearmouth stopped responding to Dr. Hantash's inquires and questions because Dr. Hantash had already invested his $4 million. Mr. Wearmouth accomplished this goal through numerous phone calls, emails, text messages, and other forms of electronic communication. Mr. Wearmouth committed these acts and others to enrich himself and to Dr. Hantash's detriment.

63.    Mr. Fenster knowingly, willfully, and with the requisite intent, defrauded and induced Dr. Hantash to wire Velanos $4 million. As a member of Deal Exchange, LLC Mr. Fenster was instrumental in connecting Dr. Hantash with Mr. Gillespie and Mr. Byrd for the purpose of defrauding Dr. Hantash of his property. Mr. Fenster perpetrated the fraud by assisting Dr. Hantash in completing the debt intake application on Deal Exchange's website. This form allegedly vetted Dr. Hantash as a proper investor for the alleged investment opportunity. Mr. Fenster furthered the SBLC Syndicate's main goal by informing Dr. Hantash that Soteria Group, LLC was interested in the opportunity and introduced Dr. Hantash to Mr. Gillespie. Mr. Fenster further misrepresented that Soteria had completed several successful financing deals. Thus, Mr. Fenster personally vouched for Mr. Gillespie's trustworthiness in furtherance of the SBLC Syndicate's goal. Mr. Fenster accomplished this goal through numerous phone calls, emails, text messages, and other

forms of electronic communication. Mr. Fenster committed these acts and others to enrich himself and to Dr. Hantash's detriment.

64.    Mr. Gillespie knowingly, willfully, and with the requisite intent, defrauded and induced Dr. Hantash to wire Velanos $4 million. As a member of Soteria, Mr. Gillespie was instrumental in connecting Dr. Hantash with Mr. Byrd for the purpose of defrauding Dr. Hantash of his property. Mr. Gillespie initially introduced Mr. Byrd to Dr. Hantash. Mr. Gillespie, along with Mr. Byrd, was responsible for informing Dr. Hantash of the SBLC investment scheme. Mr. Gillespie, through multiple communications, continuously pressured Dr. Hantash into investing his money into the SBLC Syndicate's scheme. Mr. Gillespie also represented to Dr. Hantash that it would be impossible for him to meet with prior investors. Mr. Gillespie also repeatedly assured Dr. Hantash that he and Velanos would share equally in the profits generated from the investment. Of course, this proved false. Mr. Gillespie also repeatedly misinformed Dr. Hantash that his first distribution would be fulfilled. Then, once an account freeze was in place, Mr. Gillespie misrepresented to Mr. Hantash that Mr. Byrd, Mr. Wearmouth, and Mr. Fernandes were working with the Federal Reserve and other organizations to resolve the issues. Mr. Gillespie accomplished this goal through numerous phone calls, emails, text messages, and other forms of electronic communication. Mr. Gillespie committed these acts and others to enrich himself and to Dr. Hantash's detriment.

65.    Mr. Fernandes knowingly, willfully, and with the requisite intent, defrauded and deprived Dr. Hantash of $4 million. As an alleged administrator at NTA, Mr. Fernandes was instrumental in perpetrating the SBLC Syndicate's scheme to deprive Dr. Hantash of his property. Mr. Fernandes allegedly resolved an issue with the classification of Dr. Hantash's account at NTA to further uphold the façade that NTA was a functioning U.S. bank. Following Dr. Hantash's

requests regarding the anticipated fulfillment of his first and second distributions, Mr. Fernandes never responded in clear violation of his alleged duties as an alleged NTA administrator. Mr. Fernandes further failed to respond to Dr. Hantash's messages on the NTA portal system, phone calls, voicemails, or emails. Mr. Fernandes likely could not assist Dr. Hantash because NTA is not a licensed U.S. bank, if a bank at all. Mr. Fernandes accomplished this goal by knowingly, willfully, and with the requisite intent misrepresenting to Dr. Hantash that his $4 million was secure in a NTA bank account. Mr. Fernandes committed these acts and others to enrich himself and to Dr. Hantash's detriment.

66.    Mr. Perez knowingly, willfully, and with the requisite intent, defrauded and deprived Dr. Hantash of $4 million. As an alleged director of NTA, Mr. Perez was instrumental in perpetrating the SBLC Syndicate's scheme to deprive Dr. Hantash of his property. After experiencing errors in NTA's banking system, Dr. Hantash attempted to call Edward Koziel, NTA's purported compliance officer. Instead, Mr. Perez answered the call from Dr. Hantash. Mr. Perez informed Dr. Hantash that he would forward his complaints to NTA's Swedish office to resolve his issues. Mr. Perez likely could not assist Dr. Hantash because NTA is not a licensed U.S. bank, if a bank at all. Consequently, NTA likely does not have any Swedish office or main office of operations. Mr. Perez accomplished this goal by knowingly, willfully, and with the requisite intent misrepresenting to Dr. Hantash that his $4 million was secure in a NTA bank account. Mr. Perez committed these acts and others to enrich himself and to Dr. Hantash's detriment.

67.    The SBLC Syndicate used Deal Exchange, Soteria, Velanos, and NTA to introduce, coerce, and trap Dr. Hantash into the SBLC Syndicate's investment racket. All four entities held different roles within the SBLC Syndicate. Deal Exchange, under Mr. Fenster's hand, purported to offer private equity funds to off-market assets for acquisition. In reality, Deal Exchange was used

to source victims for the SBLC Syndicate. Soteria, under Mr. Byrd and Mr. Gillespie's hands, was used to introduce Dr. Hantash and further vet him as an ideal candidate to defraud through the alleged investments offered. Velanos operated as the vehicle through which Dr. Hantash was defrauded of his $4 million. NTA, under Mr. Fernandes's hand, was used to perpetrate and prolong the fraud in an attempt to convince Dr. Hantash that everything was operating as normal.

## PATTERN OF CRIMINAL ACTIVITY

**I.    Hantash Sought Capital to Fund Life-Saving Medical Research.**

68.    Dr. Hantash is the founder and Chief Executive Officer of Escape Therapeutics, Inc. Escape Therapeutics is an early-stage biotechnology company focused on accelerating the commercial availability of allogeneic stem cell therapies. Escape Therapeutics' technology seeks to revolutionize the treatment of numerous medical diseases that require cell and/or organ replacement such as type I diabetes, Parkinson's, leukemia, and more.

69.    In January 2023, Dr. Hantash sought project financing of approximately $20 million to fund commercial development of new biotechnologies. Accordingly, Dr. Hantash tasked a member of Escape Therapeutics' Board of Directors, John P. Ferrick, with finding project financing institutions that work with biotechnology companies.

70.    Mr. Ferrick spoke with Kevin Cawley on the phone regarding Escape Therapeutics' need for financing. Mr. Cawley informed Mr. Ferrick that he would connect Escape Therapeutics with Waldon Fenster at Deal Exchange, LLC ("Deal Exchange").

71.    On or about January 26, 2023, Mr. Cawley emailed Mr. Fenster to schedule a phone call with Mr. Ferrick to inform him of a potential biotechnology opportunity.

72.    <u>Criminal Act No. 1-2: Violations of 18 U.S.C. § 1343 (Wire Fraud).</u> On or about January 26, 2023, Mr. Fenster sent an email to Mr. Ferrick requesting availability in Mr. Ferrick's

schedule. The same day, Mr. Fenster sent a second email to Mr. Ferrick and confirmed that he would call the following morning. Mr. Fenster transmitted these communications by means of interstate wire to Mr. Ferrick in furtherance of his scheme to obtain money by means of false or fraudulent pretenses, representations, or promises.

73.    Deal Exchange purports to connect private equity funds to off-market assets for acquisition. In this instance, Deal Exchange claimed it could link Escape Therapeutics, who needed project funding, with entities that offer capital.

74.    <u>Criminal Act No. 3: Violation of 18 U.S.C. § 1343 (Wire Fraud)</u>. On or about January 30, 2023, Mr. Fenster sent an email to Mr. Ferrick providing a link to Deal Exchange's intake form. Mr. Fenster transmitted this communication by means of interstate wire to Mr. Ferrick in furtherance of his scheme to obtain money by means of false or fraudulent pretenses, representations, or promises. Mr. Fenster transmitted this communication by means of interstate wire to Mr. Ferrick in furtherance of his scheme to obtain money by means of false or fraudulent pretenses, representations, or promises.

75.    Following additional phone calls with Mr. Fenster, Mr. Ferrick and Dr. Hantash completed the debt intake application on Deal Exchange's website.

**II.    Hantash is Introduced to the Criminal SBLC Syndicate.**

76.    <u>Criminal Act No. 4: Violation of 18 U.S.C. § 1343 (Wire Fraud)</u>. On or about February 8, 2023, Mr. Fenster emailed Mr. Ferrick and informed him that Soteria Group, LLC ("Soteria") was interested in having conversations about financing a debt round for the opportunity. In doing so, Mr. Fenster introduced Kevin Robert Gillespie. Mr. Fenster transmitted this communication by means of interstate wire to Mr. Ferrick in furtherance of his scheme to obtain money by means of false or fraudulent pretenses, representations, or promises.

77.    <u>Criminal Act No. 5: Violation of 18 U.S.C. § 1343 (Wire Fraud)</u>. On or about February 13, 2023, Mr. Gillespie formally met Dr. Hantash via Zoom. This meeting served as the first in a long stream of illicit actions Mr. Gillespie would undertake to defraud Dr. Hantash from his property.

78.    Mr. Gillespie represented he was a broker for Soteria. Mr. Gillespie informed Dr. Hantash of a program that grows principal to a generate a desired amount of project financing without incurring debt. Encouraged by Mr. Gillespie's suggested program, Dr. Hantash and Escape Therapeutics continued the process. Mr. Gillespie transmitted these communications by means of interstate wire to Dr. Hantash in furtherance of their scheme to obtain money by means of false or fraudulent pretenses, representations, or promises.

79.    <u>Criminal Act No. 6: Violation of 18 U.S.C. § 1343 (Wire Fraud)</u>. During this Zoom call on or about February 13, 2023, Mr. Fenster represented and personally confirmed to Mr. Ferrick and Dr. Hantash that Soteria had completed several project-financing deals, including Mr. Fenster's own Cannabis company which received its desired project financing. Mr. Fenster personally vouched for Mr. Gillespie's trustworthiness. Mr. Fenster transmitted these communications by means of interstate wire to Dr. Hantash in furtherance of his scheme to obtain money by means of false or fraudulent pretenses, representations, or promises.

80.    <u>Criminal Act No. 7: Violation of 18 U.S.C. § 1343 (Wire Fraud)</u>. Following their first Zoom meeting, Dr. Hantash provided Mr. Gillespie with a term sheet. On or about February 16, 2023, Mr. Gillespie emailed Dr. Hantash to inform him that the term sheet was approved. Mr. Gillespie also provided Dr. Hantash with a checklist of documents needed to move forward. Mr. Gillespie transmitted these communications by means of interstate wire to Dr. Hantash in

furtherance of his scheme to obtain money by means of false or fraudulent pretenses, representations, or promises.

81.    <u>Criminal Act No. 8: Violations of 18 U.S.C. § 1343 (Wire Fraud)</u>. On or about February 19, 2023, Mr. Fenster emailed Dr. Hantash to say that the purported term sheet had been approved. Mr. Fenster also asked Dr. Hantash if he had any questions regarding the term sheet. Mr. Fenster transmitted this communication by means of interstate wire to Dr. Hantash in furtherance of his scheme to obtain money by means of false or fraudulent pretenses, representations, or promises.

82.    <u>Criminal Act No. 9: Violations of 18 U.S.C. § 1343 (Wire Fraud)</u>. On or about February 26, 2023, Mr. Gillespie followed up with Dr. Hantash via email to ask if the latter had any questions regarding the term sheet. Mr. Gillespie transmitted this communication by means of interstate wire to Dr. Hantash in furtherance of his scheme to obtain money by means of false or fraudulent pretenses, representations, or promises.

83.    <u>Criminal Act No. 10: Violation of 18 U.S.C. § 1343 (Wire Fraud)</u>. On or about March 3, 2023, Mr. Gillespie informed Dr. Hantash that he was still working to accommodate his requests on the term sheet. Mr. Gillespie transmitted this communication by means of interstate wire to Dr. Hantash in furtherance of his scheme to obtain money by means of false or fraudulent pretenses, representations, or promises.

84.    <u>Criminal Acts Nos. 11-12: Violations of 18 U.S.C. § 1343 (Wire Fraud)</u>. On or about March 13, 2023, Dr. Hantash coordinated with Mr. Gillespie in drafting and signing a new term sheet as well as providing the checklist of documents needed. Specifically, Mr. Gillespie emailed Dr. Hantash that he would provide a new term sheet the same day. Approximately three hours later, Mr. Gillespie sent a separate email to Dr. Hantash with the new term sheet. Mr.

Gillespie transmitted these communications by means of interstate wire to Dr. Hantash in furtherance of his scheme to obtain money by means of false or fraudulent pretenses, representations, or promises.

85.     <u>Criminal Acts Nos. 13-15: Violations of 18 U.S.C. § 1343 (Wire Fraud)</u>. On or about March 15, 2023, Mr. Gillespie emailed Dr. Hantash to arrange a phone to explain the details of the investment opportunities with Soteria. Two hours later, Mr. Gillespie emailed Dr. Hantash with an invite for a call titled "SBLC Introduction." The same day, Mr. Gillespie and Dr. Hantash had call wherein Mr. Gillespie explained the details of the SBLC investment.  Mr. Gillespie transmitted these communications by means of interstate wire to Dr. Hantash in furtherance of his scheme to obtain money by means of false or fraudulent pretenses, representations, or promises.

86.     <u>Criminal Act No. 16: Violation of 18 U.S.C. § 1343 (Wire Fraud)</u>. On or about March 19, 2023, Mr. Gillespie provided Dr. Hantash with a template Letter of Intent to review. Mr. Gillespie requested that Dr. Hantash customize the details of the template Letter of Intent and return the document. Mr. Gillespie transmitted this communication by means of interstate wire to Dr. Hantash in furtherance of his scheme to obtain money by means of false or fraudulent pretenses, representations, or promises.

87.     <u>Criminal Act No. 17: Violation of 18 U.S.C. § 1343 (Wire Fraud)</u>. Next, on or about March 21, 2023, Mr. Gillespie emailed an invite for a call titled SBLC Procedures with the purpose to introduce Dr. Hantash to James William Byrd, the purported owner of Soteria. Mr. Gillespie transmitted this communication by means of interstate wire to Dr. Hantash in furtherance of his scheme to obtain money by means of false or fraudulent pretenses, representations, or promises.

88.    <u>Criminal Act No. 18: Violation of 18 U.S.C. § 1343 (Wire Fraud)</u>. On or about March 21, 2023, Mr. Bryd explained that his separate company, Velanos Principal Capital ("Velanos") would be able to satisfy Escape Therapeutics' need for project financing.

89.    Mr. Byrd represented that Velanos had a $500 billion quarterly allocation to purchase new $100 million notes for $44 million and resell them for a profit over the course of one to four days. Mr. Byrd also explained that Velanos always had a buyer for the note identified prior to making the initial purchase. This appeared to be the exact thing Escape Therapeutics and Dr. Hantash needed to fund their life-saving research. Mr. Byrd transmitted these communications by means of interstate wire to Dr. Hantash in furtherance of their scheme to obtain money by means of false or fraudulent pretenses, representations, or promises.

### III.    The SBLC Syndicate Deceives Hantash with a Fake Prior Investor.

90.    <u>Criminal Acts Nos. 19-20: Violation of 18 U.S.C. § 1343 (Wire Fraud)</u>. On or about March 22, 2023, Dr. Hantash had a follow up phone call with Mr. Byrd and his partner, Joshua M. Wearmouth. Mr. Byrd and Mr. Wearmouth explained how their program worked and how Dr. Hantash could choose the investment duration and proposed desired return. Mr. Byrd and Mr. Wearmouth also indicated that there was absolutely zero downside risk. Mr. Wearmouth and Mr. Byrd transmitted these communications by means of interstate wire to Dr. Hantash in furtherance of their scheme to obtain money by means of false or fraudulent pretenses, representations, or promises.

91.    On or about March 24, 2023, Dr. Hantash, after customizing the details as Mr. Gillespie requested, returned the Letter of Intent to Mr. Byrd.

92.    <u>Criminal Act No. 21: Violation of 18 U.S.C. § 1343 (Wire Fraud)</u>. On or about March 28, 2023, Mr. Gillespie emailed Dr. Hantash to work out certain details of their agreement including the saturation point, personal information, and the sum to be invested. Mr. Gillespie

transmitted this communication by means of interstate wire to Dr. Hantash in furtherance of his scheme to obtain money by means of false or fraudulent pretenses, representations, or promises.

93.    <u>Criminal Act No. 22: Violation of 18 U.S.C. § 1343 (Wire Fraud)</u>. On or about March 22, 2023, Mr. Byrd and Mr. Wearmouth encouraged Dr. Hantash through phone calls to invest prior to March 31, 2023, because Mr. Wearmouth would close off the deal to new investments lower than $44 million after that date. Mr. Byrd and Mr. Wearmouth transmitted these communications by means of interstate wire to Dr. Hantash in furtherance of their scheme to obtain money by means of false or fraudulent pretenses, representations, or promises.

94.    <u>Criminal Act No. 23: Violation of 18 U.S.C. § 1343 (Wire Fraud)</u>. On or about March 28, 2023, Mr. Wearmouth, as an agent of Velanos, caused Docusign to send Dr. Hantash a copy of a Joint Venture Agreement ("JV Agreement") to sign. Finding several errors in the draft JV Agreement, Dr. Hantash emailed Mr. Wearmouth requesting certain corrections. Mr. Wearmouth transmitted this communication by means of interstate wire to Dr. Hantash in furtherance of his scheme to obtain money by means of false or fraudulent pretenses, representations, or promises.

95.    <u>Criminal Acts Nos. 24-26: Violation of 18 U.S.C. § 1343 (Wire Fraud)</u>. In response, Dr. Hantash requested to speak to any references regarding the program as part of his normal due diligence. On or about March 29, 2023, Mr. Byrd, Mr. Wearmouth, and Mr. Gillespie all indicated via text messages to Dr. Hantash that fulfilling such a request was not possible because no investor wants to speak about their private financial affairs for an invite-only program like theirs. Nevertheless, they said would attempt to find a reference with whom Dr. Hantash could discuss the investment. Mr. Gillespie, Mr. Byrd, and Mr. Wearmouth transmitted this communication by

means of interstate wire to Dr. Hantash in furtherance of their scheme to obtain money by means of false or fraudulent pretenses, representations, or promises.

96.    <u>Criminal Act No. 27: Violations of 18 U.S.C. § 1343 (Wire Fraud)</u>. On or about March 31, 2023, Mr. Byrd ultimately acquiesced and introduced Mr. Gibbins to Dr. Hantash via text. Mr. Byrd transmitted this communication by means of interstate wire to Dr. Hantash in furtherance of his scheme to obtain money by means of false or fraudulent pretenses, representations, or promises.

97.    On or about March 31, 2023, Dr. Hantash spoke with Mr. Gibbins. Mr. Gibbins described himself as a long-time banker very familiar with the type of instruments Velanos was advertising to Dr. Hantash. Mr. Gibbins confirmed that his group invested $10 million and, 90 days later, received $10 million in profit in addition to their $10 million initial capital investment. Mr. Gibbins also indicated that his group would be investing a second round with Velanos. Mr. Gibbins transmitted this communication by means of interstate wire to Dr. Hantash in furtherance of his scheme to obtain money by means of false or fraudulent pretenses, representations, or promises.

98.    The next day, Dr. Hantash attempted to call Mr. Gibbins with a few follow-up questions and clarifications regarding tax treatment of the program profits, but Mr. Gibbins did not answer the phone or reply to Dr. Hantash's messages.

99.    <u>Criminal Acts Nos. 28-29: Violation of 18 U.S.C. § 1343 (Wire Fraud)</u>. On or about April 3 and 4, 2023, Mr. Byrd and Mr. Gillespie called Dr. Hantash regarding his decision to invest in the program and again applied pressure to commit to the investment quickly. Mr. Byrd and Mr. Gillespie transmitted these communications by means of interstate wire to Dr. Hantash in furtherance of their scheme to obtain money by means of false or fraudulent pretenses, representations, or promises.

100.    <u>Criminal Act No. 30: Violation of 18 U.S.C. § 1343 (Wire Fraud)</u>. On or about April 3, 2023, Dr. Hantash expressed that he had additional questions for Mr. Gibbins. In response, Mr. Byrd explained via phone that Mr. Gibbins was in the hospital for a cardiac-related issue and not able to answer his call. Mr. Byrd transmitted this communication by means of interstate wire to Dr. Hantash in furtherance of his scheme to obtain money by means of false or fraudulent pretenses, representations, or promises.

101.    <u>Criminal Acts Nos. 31-34: Violation of 18 U.S.C. § 1343 (Wire Fraud)</u>. Between approximately April 5 and April 13, 2023, Dr. Hantash went back and forth with Mr. Byrd and Mr. Wearmouth over email rectifying a laundry list of questions and items that needed to be fixed in the JV Agreement before he would sign. Mr. Byrd responded and answered all of Dr. Hantash's questions to assuage his concerns – further inducing Dr. Hantash to enter the fraudulent JV Agreement. Mr. Byrd transmitted these communications by means of interstate wire to Dr. Hantash in furtherance of his scheme to obtain money by means of false or fraudulent pretenses, representations, or promises.

**IV.    Hantash Invests His Money with the SBLC Syndicate.**

102.    <u>Criminal Act No. 35: Violation of 18 U.S.C. § 1343 (Wire Fraud)</u>. On or about April 12, 2023, Velanos, through its agents, caused Docusign to transmit the final version of the JV Agreement to Dr. Hantash. The same day, Dr. Hantash and Velanos executed the JV Agreement whereby Dr. Hantash would contribute Four Million Dollars ($4,000,000) in capital to Velanos. The JV Agreement stipulated that Dr. Hantash would receive 50% of the proceeds from the $4 million investment approximately 30 days after sending the funds and a second distribution of up to $16 million by July 13, 2023 – 90 calendar days after commencing the investment. Velanos, through its agents, transmitted these communications by means of interstate wire to Dr. Hantash

in furtherance of his scheme to obtain money by means of false or fraudulent pretenses, representations, or promises

103.    On or about April 14, 2023, Dr. Hantash deposited, in two separate wires of equal magnitude, Four Million Dollars ($4,000,000) in committed capital with Velanos pursuant to the JV Agreement.

104.    Criminal Act No. 36: Violation of 18 U.S.C. § 1343 (Wire Fraud). On or about April 29, 2023, Mr. Bryd, via phone call, represented to Dr. Hantash that he had acquired two international banks to receive his funds. One of these banks was a Swedish entity named Nordic Trust Alliance KB ("NTA"). Mr. Bryd represented that NTA was a licensed U.S. Bank. This would later prove to be completely false. Upon information and belief, the second entity is AGFC Capital Trust ("AGFC"). AGFC has a Geneva location but does not appear to be a legitimate bank. Instead, both NTA and AGFC appear to be lead-generating for the purpose of identifying more victims of Defendants' scheme. Mr. Byrd transmitted this communication by means of interstate wire to Dr. Hantash in furtherance of his scheme to obtain money by means of false or fraudulent pretenses, representations, or promises.

105.    Criminal Act No. 37: Violation of 18 U.S.C. § 1343 (Wire Fraud). On April 24, 2023, Dr. Hantash emailed Mr. Gillespie regarding the underwriting period for the JV Agreement. Mr. Gillespie further reassured Dr. Hantash that the underwriting had already occurred and that all was going well with the investment plan. Mr. Gillespie transmitted this communication by means of interstate wire to Dr. Hantash in furtherance of his scheme to obtain money by means of false or fraudulent pretenses, representations, or promises.

## V.    Hantash Began Probing the SBLC Syndicate Regarding Discrepancies He Noticed.

106.    On or about May 1, 2023, and following Dr. Hantash depositing his capital, Dr. Hantash began to notice discrepancies between what Mr. Gillespie and Mr. Byrd were telling him

regarding the mechanics of the investment. Accordingly, Dr. Hantash emailed Mr. Gillespie to request clarification on the details of his investment.

107.    <u>Criminal Act No. 38: Violations of 18 U.S.C. § 1343 (Wire Fraud)</u>. On May 2, 2023, Mr. Gillespie responded to placate Dr. Hantash's concerns. Mr. Gillespie responded to each of Dr. Hantash's five concerns and provided excuses such as typographical errors in the JV Agreement, explanations of how funds would be transferred to Escape Therapeutics, and the original draw schedule of three tranches for the investment. Mr. Gillespie transmitted this communication by means of interstate wire to Dr. Hantash in furtherance of his scheme to obtain money by means of false or fraudulent pretenses, representations, or promises.

108.    <u>Criminal Acts Nos. 39-41: Violations of 18 U.S.C. § 1343 (Wire Fraud)</u>. On or about May 10, 2023, Dr. Hantash requested and had another phone call with Mr. Gillespie. On or about May 11, 2023, and during this call, Mr. Wearmouth touted that the per trade profit of the investment was approximately 55%. Mr. Gillespie also assured Dr. Hantash that him and Velanos would share equally in the profits generated from the investment. To the contrary, Mr. Byrd stated Dr. Hantash's profits were capped but Velanos could continue earning profits using Dr. Hantash's capital.

109.    In response to Dr. Hantash's concerns, Mr. Gillespie repeatedly assured Dr. Hantash that him and Velanos would share the same, identical profits from the investment. Mr. Byrd maintained his position that Velanos could continue using Dr. Hantash's capital after the investment reached a saturation point for Velanos's pure profit.

110.    Disturbed by Mr. Gillespie and Mr. Byrd's contradictions, Dr. Hantash requested weekly updates on the trades executed with his capital including the account balance. Dr. Hantash

was entitled to this information under the JV Agreement to allow him to determine when to withdraw his capital.

111.    Mr. Byrd refused to ever provide Dr. Hantash with the requested trade details or account balance figures. Mr. Gillespie also could not furnish this information. Mr. Wearmouth never responded to Dr. Hantash's inquiries. Mr. Gillespie, Mr. Byrd, and Mr. Wearmouth transmitted these communications by means of interstate wire to Dr. Hantash in furtherance of their scheme to obtain money by means of false or fraudulent pretenses, representations, or promises.

112.    Growing more concerned, Dr. Hantash decided to contact Velanos' previous client reference, Mr. Gibbins. Mr. Gibbins never answered Dr. Hantash's calls or responded to his messages.

113.    On or about May 12, 2023, and approximately 30 calendar days after the JV Agreement was executed, Dr. Hantash emailed Mr. Byrd and Mr. Wearmouth regarding opening a bank account of his own so that he can monitor his deposited funds. Dr. Hantash also reminded Mr. Byrd and Mr. Wearmouth of the emotional gravity this investment has and what is at stake. On May 25, 2023, Dr. Hantash followed up with Mr. Byrd and Mr. Wearmouth because he had not yet received a response.

114.    On or about May 30, 2023, and approximately 30 banking days after the JV Agreement was executed, Dr. Hantash inquired regarding the timing of the first distribution and the account balance. The JV Agreement indicated that Dr. Hantash could withdraw from the program within 10 banking days after 30 banking days from execution.

115.    <u>Criminal Act No. 42: Violation of 18 U.S.C. § 1343 (Wire Fraud)</u>. Finally, Mr. Gillespie, responded to arrange a phone call set for June 1, 2023. Mr. Gillespie transmitted this

communication by means of interstate wire to Dr. Hantash in furtherance of his scheme to obtain money by means of false or fraudulent pretenses, representations, or promises.

116.    <u>Criminal Act No. 43: Violation of 18 U.S.C. § 1343 (Wire Fraud)</u>. During the phone call on or about May 31, 2023, Mr. Byrd responded that 30 banking days had not yet lapsed. Dr. Hantash informed Mr. Byrd that, even with the most generous calculation of days lapsed – 30 days after 10 days after the execution of the JV Agreement (40 days total) – the first distribution of Four Million Dollars ($4,000,000) was due on June 9, 2023. Mr. Byrd transmitted this communication by means of interstate wire to Dr. Hantash in furtherance of his scheme to obtain money by means of false or fraudulent pretenses, representations, or promises.

117.    On or about June 5, 2023, Dr. Hantash again emailed Mr. Byrd, Mr. Wearmouth, and Mr. Gillespie asking for an update on the status of his investment.

118.    <u>Criminal Act No. 44-45: Violation of 18 U.S.C. § 1343 (Wire Fraud)</u>. On or about June 7, 2023, Mr. Byrd informed Dr. Hantash that he would call him that evening to answer Dr. Hantash's questions. During the phone call, Mr. Byrd and Mr. Gillespie informed Dr. Hantash that the first distribution was forthcoming. This proved to be false. Mr. Byrd and Mr. Gillespie transmitted these communications by means of interstate wire to Dr. Hantash in furtherance of their scheme to obtain money by means of false or fraudulent pretenses, representations, or promises.

119.    On or about June 17, 2023, Dr. Hantash provided instructions for the first distribution to be wired to the same account listed in the JV Agreement as the original source of the funds contributed to the fund. Dr. Hantash also requested Mr. Byrd create a personal checking account at the NTA bank only if NTA did not have wire limits.

120.    <u>Criminal Act No. 46: Violation of 18 U.S.C. § 1343 (Wire Fraud)</u>. On or about June 18, 2023, Dr. Hantash received a bank account application form from Mr. Wearmouth. Interestingly, Mr. Wearmouth's email came from a Velanos domain, not an NTA domain. Nevertheless, Dr. Hantash completed the application. The same day, Dr. Hantash emailed NTA's primary email address to request the bank's fee schedules for outgoing wires. Mr. Wearmouth transmitted this communication by means of interstate wire to Dr. Hantash in furtherance of his scheme to obtain money by means of false or fraudulent pretenses, representations, or promises.

121.    On or about June 18, 2023, Dr. Hantash also emailed Mr. Wearmouth to restate Dr. Hantash's intention to act on his rights under the JV Agreement to trade on his investment.

122.    <u>Criminal Act No. 47: Violations of 18 U.S.C. § 1343 (Wire Fraud)</u>. On or about June 20, 2023, Mr. Wearmouth caused Docusign to send Dr. Hantash a complete bank account application form to sign via email. Mr. Wearmouth transmitted this communication by means of interstate wire to Dr. Hantash in furtherance of his scheme to obtain money by means of false or fraudulent pretenses, representations, or promises.

123.    <u>Criminal Act No. 48 Violations of 18 U.S.C. § 1343 (Wire Fraud)</u>. On or about June 20, 2023, and upon accessing the account, Dr. Hantash noticed that while the application stated the account would be a private checking account, NTA created a business checking account for Dr. Hantash instead. The business name on the account was Elucent LLC, which is not even Dr. Hantash's company that was party to the JV Agreement. Accordingly, Mr. Wearmouth and NTA, through its agents, caused the transmission of a fake webpage to Dr. Hantash to further their fraudulent scheme. Dr. Hantash informed NTA of this error via email. Mr. Wearmouth and NTA transmitted this communication by means of interstate wire to Dr. Hantash in furtherance of his scheme to obtain money by means of false or fraudulent pretenses, representations, or promises.

124.    <u>Criminal Act No. 49: Violation of 18 U.S.C. § 1343 (Wire Fraud)</u>. On or about June 21, 2023, Dr. Hantash noticed a ledger entry showing $4 million was credited to his NTA account. "Velanos – FST Credit" was listed as the source. NTA, through its agents, had caused a fake webpage to be transmitted to Dr. Hantash to illustrate a fake wire transfer. Dr. Hantash quickly informed Mr. Byrd that he did not instruct any funds to be transferred, but Mr. Byrd failed to address this issue. NTA transmitted this communication by means of interstate wire to Dr. Hantash in furtherance of his scheme to obtain money by means of false or fraudulent pretenses, representations, or promises.

125.    <u>Criminal Act No. 50: Violation of 18 U.S.C. § 1343 (Wire Fraud)</u>. On or about June 29, 2023, Dr. Hantash again emailed NTA's email address to request his account be changed from a business account to a personal checking account. NTA's purported admin, Defendant Daniel Fernandes caused the change to be made the same day. In reality, this change meant nothing because the entire account was later revealed to be fake. NTA, through its agents, transmitted this communication by means of interstate wire to Dr. Hantash in furtherance of his scheme to obtain money by means of false or fraudulent pretenses, representations, or promises.

126.    <u>Criminal Act No. 51: Violation of 18 U.S.C. § 1343 (Wire Fraud)</u>. On or about June 30, Dr. Hantash attempted to execute an outgoing wire request from his NTA account of $4 million. Dr. Hantash also emailed NTA to request that the outgoing wire transfer be approved immediately. The same day, Dr. Hantash received a private message through the NTA portal that the wire request had been cancelled without providing any explanation. NTA transmitted this communication by means of interstate wire to Dr. Hantash in furtherance of his scheme to obtain money by means of false or fraudulent pretenses, representations, or promises.

127.    <u>Criminal Act No. 52: Violation of 18 U.S.C. § 1343 (Wire Fraud)</u>. On or about July 1, 2023, Dr. Hantash again attempted to execute an outgoing wire request from his NTA account for $3.99 million. The NTA website displayed that the transfer was executed on July 1, 2023, with an expected receipt date of July 5, 2023. This webpage was fake because no wire transfer had been executed. NTA transmitted this communication by means of interstate wire to Dr. Hantash in furtherance of his scheme to obtain money by means of false or fraudulent pretenses, representations, or promises.

128.    <u>Criminal Act No. 53: Violation of 18 U.S.C. § 1343 (Wire Fraud)</u>. On or about July 5, 2023, the funds did not arrive. Instead, NTA, through its agents, caused an admin message to appear and indicate that due to a restriction, the funds would now be received on July 13, 2023. This message also turned out to be false because, on or about July 13, 2023, the funds did not arrive. Notably, July 13, 2023, was also the same date on which the *second* distribution was due to Dr. Hantash pursuant to the JV Agreement. Dr. Hantash had yet to receive any funds from his investment. NTA transmitted this communication by means of interstate wire to Dr. Hantash in furtherance of his scheme to obtain money by means of false or fraudulent pretenses, representations, or promises.

129.    Between July 5, and July 13, 2023, Dr. Hantash repeatedly contacted Mr. Byrd to determine whether the JV Agreement would be extended, and the funds would remain in the NTA account. Mr. Byrd never sent any addendum or further directive pursuant to the JV Agreement. Therefore, Dr. Hantash directed the funds from the second distribution to be wired to a non-NTA account.

130.    The purported NTA admin, Mr. Fernandes, never responded to Dr. Hantash's requests to trace the second distribution or the July 1, 2023, transfer of $3.99 million. Mr.

Fernandes did not respond to phone calls, emails, or online messages through the NTA portal system. Dr. Hantash was consistently sent to Mr. Fernandes' voicemail. Mr. Fernandes never responded. Nor did any representative from NTA furnish any documentation or reasoning to support the failed wire transfer.

131.    Criminal Act No. 54: Violation of 18 U.S.C. § 1343 (Wire Fraud). Between June 20 and June 26, 2023, Mr. Byrd contacted Dr. Hantash via phone to provide an explanation for NTA's failure to complete the wire transfer. The only explanation Mr. Byrd was able to provide was that Dr. Hantash should only execute a wire that leaves in the account a portion of the funds received into the NTA account. Mr. Byrd transmitted this communication by means of interstate wire to Dr. Hantash in furtherance of his scheme to obtain money by means of false or fraudulent pretenses, representations, or promises

132.    Criminal Acts Nos. 55-56: Violation of 18 U.S.C. § 1343 (Wire Fraud). As his suspicions grew, Dr. Hantash requested a proof of funds for the NTA account. On or about July 21, 2023, Dr. Hantash logged into his NTA portal. Instead of showing $4,000,000 in the account, the NTA portal now showed a balance of only $10,000. The same day, Dr. Hantash initiated a wire to transfer the $10,000 out of the NTA account. NTA, through its agents, caused a private message to be sent to Dr. Hantash through the NTA portal showing that the wire was executed on the same day. The NTA portal displaying a balance of $10,000 and the private message were both fake and/or false and created by NTA to further string Dr. Hantash along. NTA, through its agents, transmitted this communication by means of interstate wire to Dr. Hantash in furtherance of his scheme to obtain money by means of false or fraudulent pretenses, representations, or promises

133.    To date, Dr. Hantash has not received any completed wire transfer for funds leaving the NTA account. The NTA account displays a balance of approximately negative $40 due to bank fees assessed for the account.

## VI.    Hantash Sends the SBLC Syndicate a Notice of Breach of Contract Under the Joint Venture Agreement.

134.    On or about July 27, 2023, Dr. Hantash sent Mr. Byrd, Mr. Wearmouth, and Mr. Gillespie an email to provide a notice of breach of contract to the JV Agreement. Dr. Hantash's email outlined the multiple deficiencies, breaches, and failures to perform for which Mr. Byrd, Mr. Wearmouth, and Mr. Gillespie were responsible. These breaches included, but were not limited to, failure distribute Dr. Hantash's funds as anticipated, failure to allow Dr. Hantash to direct his funds per his discretion, and failure to notify Dr. Hantash with any details regarding his investment. Dr. Hantash's email also provided notice to Mr. Byrd, Mr. Wearmouth, and Mr. Gillespie of the scope of his anticipated damages, but directly and indirectly related to the breach.

135.    <u>Criminal Act No. 57: Violation of 18 U.S.C. § 1343 (Wire Fraud)</u>. On or about July 27, 2023, Dr. Hantash also emailed Edward Koziel, NTA's purported compliance officer regarding the wires that were not executed and the deeply concerning fact his account now showed a $0 balance. Upon calling his listed number, the individual muttered his name – "Eddie Perez." The individual answered startled and, after gathering his thoughts, told Dr. Hantash that he would send a message to NTA's office in Sweden to contact Dr. Hantash and resolve the issues. Dr. Hantash later learned that Eddie Perez was an alias for Heriberto Candelario Perez Valdes, a Director of NTA. Mr. Perez transmitted this communication by means of interstate wire to Dr. Hantash in furtherance of his scheme to obtain money by means of false or fraudulent pretenses, representations, or promises.

136.    Both Mr. Fernandes and Mr. Perez were named defendants in a lawsuit brought by the SEC in the United States District Court for the District of Massachusetts for their roles in orchestrating a Ponzi scheme and defrauding individuals out of approximately fifteen million dollars ($15,000,000).

137.    On or about August 7, 2023, and after receiving no response to either of his previous emails, Dr. Hantash emailed Mr. Koziel at NTA to respond to his prior question. The same day Dr. Hantash also emailed Mr. Byrd, Mr. Wearmouth, and Mr. Gillespie to respond to his prior notice of breach of contract. Indeed, in Dr. Hantash's email to Mr. Byrd, Mr. Wearmouth, and Mr. Gillespie, he told the receiving parties that he was now aware that NTA is not a bank, foreign bank, or trust bank in the United States, Sweden, or Switzerland.

138.    Criminal Act No. 58: Violation of 18 U.S.C. § 1343 (Wire Fraud). On or about August 7, 2023, and following multiple requests for wire instructions and additional details, Mr. Byrd spoke with Dr. Hantash on the phone regarding his concerns. Mr. Byrd admitted NTA was not a U.S. licensed bank. Now, Mr. Byrd claimed NTA was a foreign bank licensed in Switzerland and Sweden. Mr. Byrd was unable to provide any proof of a foreign banking license in either country. Mr. Byrd transmitted this communication by means of interstate wire to Dr. Hantash in furtherance of his scheme to obtain money by means of false or fraudulent pretenses, representations, or promises.

139.    Dr. Hantash followed up with additional emails to Mr. Byrd, Mr. Wearmouth, and Mr. Gillespie on August 8 and August 9, 2023. In these emails, Dr. Hantash explained that he had received multiple liquidation notices pertaining to his wife's brokerage account., the same account from which Hantash borrowed funds to make the original $4,000,000 investment into the JV Agreement. Dr. Hantash previously explained that he was borrowing the funds from the brokerage

account and that funds needed to be repaid in 90 days, thus explaining Dr. Hantash's focus on understanding what return was feasible within a 90-day turnaround time. Mr. Byrd, Mr. Wearmouth, and Mr. Gillespie went silent.

140.    On or about August 11, 2023, Dr. Hantash again emailed Mr. Byrd, Mr. Wearmouth, and Mr. Gillespie requesting proof of funds for the second distribution due from his investment. Dr. Hantash also drew attention to his latest conversation with Mr. Byrd wherein Mr. Byrd explained he was not part of Velanos. Mr. Byrd has a Velanos email address and consistently held himself out as the individual with control over Velanos' operations.

141.    <u>Criminal Act No. 59: Violation of 18 U.S.C. § 1343 (Wire Fraud)</u>. On or about August 15, 2023, Dr. Hantash emailed Mr. Fenster and Mr. Gillespie as a demand to share Deal Exchange's D&O policy and carrier information for claims against Velanos and/or Soteria. Mr. Fenster responded via email and told Dr. Hantash that he had no communication or information regarding Dr. Hantash's SBLC investment since April 2023. This is inconsequential. Mr. Fenster's actions from January through April 2023 solidified his and Deal Exchange's role in the SBLC Syndicate for which he is liable. Mr. Fenster transmitted this communication by means of interstate wire to Dr. Hantash in furtherance of his scheme to obtain money by means of false or fraudulent pretenses, representations, or promises.

142.    On or about August 17, 2023, having received no response to his prior emails, Dr. Hantash sent a follow up email to Mr. Byrd, Mr. Wearmouth, and Mr. Gillespie regarding Velanos' breach of contract in relation to the JV Agreement.

143.    <u>Criminal Act No. 60: Violation of 18 U.S.C. § 1343 (Wire Fraud)</u>. On or about August 23, 2023, Mr. Byrd represented to Dr. Hantash via text message that he had an update regarding his investment. Dr. Hantash emailed Mr. Byrd and Mr. Wearmouth encouraging Mr.

Byrd to dictate his update in an email. Mr. Byrd did not respond. Mr. Byrd transmitted this communication by means of interstate wire to Dr. Hantash in furtherance of his scheme to obtain money by means of false or fraudulent pretenses, representations, or promises

144.    On or about August 29, 2023, Dr. Hantash emailed Mr. Gibbins, the supposed previously successful investor to whom Mr. Byrd and Mr. Gillespie referred Dr. Hantash, to inquire about his experience and set up a phone call. Mr. Gibbins did not respond.

145.    On or about August 28 and 29, 2023, Dr. Hantash emailed a notice of default under the JV Agreement to Lucia Harris (a/k/a Lucia Alves) and James Hutchinson, two directors of Velanos.

146.    <u>Criminal Act No. 61: Violations of 18 U.S.C. § 1343 (Wire Fraud)</u>. On or about August 29, 2023, Ms. Harris responded to Dr. Hantash's email stating that she would review his complaint and would follow up with Dr. Hantash once done. Ms. Harris transmitted this communication by means of interstate wire to Dr. Hantash in furtherance of his scheme to obtain money by means of false or fraudulent pretenses, representations, or promises.

147.    <u>Criminal Act No. 62: Violations of 18 U.S.C. § 1343 (Wire Fraud)</u>. On or about August 29, 2023, Mr. Hutchinson responded to Dr. Hantash's email stating that he was in receipt of Dr. Hantash's complaint and that he would look into the matter. Mr. Hutchinson never responded in substance. Mr. Hutchinson transmitted this communication by means of interstate wire to Dr. Hantash in furtherance of his scheme to obtain money by means of false or fraudulent pretenses, representations, or promises

148.    <u>Criminal Act No. 63: Violations of 18 U.S.C. § 1343 (Wire Fraud)</u>. On or about September 1, 2023, Dr. Hantash sent follow up emails to Ms. Harris and Mr. Hutchinson. Ms. Harris responded on September 3, 2023, that Velanos does not have D&O insurance that she

"cannot speak to the US Velanos Corporation." Ms. Harris also stated that she was not aware of any account Dr. Hantash may or may not have had with NTA. Ms. Harris transmitted this communication by means of interstate wire to Dr. Hantash in furtherance of his scheme to obtain money by means of false or fraudulent pretenses, representations, or promises.

149.    Criminal Act No. 64: Violations of 18 U.S.C. § 1343 (Wire Fraud). In a separate email on September 3, 2023, Ms. Harris told Dr. Hantash that she would provide him with information for her lawyer separate from Velanos should a lawsuit be filed. Ms. Harris also represented that she would reach out to NTA to request an explanation regarding Dr. Hantash's concerns. Ms. Harris transmitted this communication by means of interstate wire to Dr. Hantash in furtherance of his scheme to obtain money by means of false or fraudulent pretenses, representations, or promises.

150.    Criminal Act No. 65: Violations of 18 U.S.C. § 1343 (Wire Fraud). On or about September 6, 2023, Ms. Harris emailed Dr. Hantash to say that she had not been a director at Velanos since January 27, 2023 – prior to the execution of the JV Agreement. Ms. Harris transmitted this communication by means of interstate wire to Dr. Hantash in furtherance of his scheme to obtain money by means of false or fraudulent pretenses, representations, or promises.

151.    On or about October 3, 2023, Dr. Hantash again emailed Mr. Byrd, Mr. Wearmouth, and Mr. Gillespie regarding their failure to respond to his notice of default and their failure to cure their material breach of the JV Agreement.

**VII.    Hantash Learns He is the Latest Victim to the SBLC Syndicate's Repeated Fraudulent Schemes.**

152.    As days went by with no clear answers and no money returned, Dr. Hantash's suspicions grew that he had fallen victim to a multi-million-dollar fraudulent scheme. Accordingly, Mr. Hantash took it upon himself to research the individuals with whom he was in contact.

153.    Dr. Hantash learned that Mr. Byrd was involved with an entity called FCC Capital Ventures in Dallas, Texas, albeit under the alias "Wilbur Byrd." Dr. Hantash further learned that Mr. Byrd was involved in a lawsuit related to FCC Capital Ventures in which it is alleged Mr. Byrd induced others into an investment fraud scheme. The relevant case is captioned as: Cause No. DC-21-05384 – *Aexonis Holdings, Inc. v. Wilbur Byrd, et al.* in the 101st District Court, Dallas County, Texas ("Aexonis Lawsuit").

154.    Dr. Hantash contacted the plaintiff's attorney in the newly discovered lawsuit. The plaintiff's attorney indicated that at least five other individuals/entities had contacted him with concerns about investment fraud related to Mr. Byrd and entities under his control – each for tens of millions of dollars.

155.    Dr. Hantash also learned that many individuals with whom he was in contact regarding his investment had provided pseudonyms or slightly misspelled names. For example, James William Byrd went by the name Wilbur Byrd based on the Aexonis Lawsuit. Velanos' Canadian bank officer was listed as "Jasotha Ulganathan"; however, further researched revealed the correct spelling was "Jasotha Ulaganathan." Hantash also learned that the reference investor with whom he spoke, and to whom Defendants consistently referred to as "Martin Gibbons," was more accurately spelled "Martin Gibbins." Additionally, the head of the NTA bank was introduced as "Danyel Fernandes" originally, when his real name is "Daniel Fernandes."

156.    Dr. Hantash also learned that Mr. Byrd, Mr. Wearmouth, and NTA were all defendants in a lawsuit brought by Genie Investments NV in Florida Federal court. The relevant case is captioned as: Case No. 6:24-cv-271-ACC-LHP – *Genie Investments NV, LLC v. Joshua Wearmouth, James William Byrd, and Nordic Trust Alliance KB, LLC* in the in the United States District Court for the Middle District of Florida, Jacksonville Division ("Genie Lawsuit").

157.    In the Genie lawsuit, Plaintiff Genie Investments NV, LLC ("Genie") allege Mr. Byrd and Mr. Wearmouth defrauded Genie into contributing a total of nine million dollars ($9,000,000) into an investment with Velanos. Mr. Byrd, Mr. Wearmouth, and Velanos also worked with NTA to further their scheme against Genie, even including creating a fake bank account to display Genie's alleged investment.

158.    The structure of the scheme in the Genie Lawsuit is nearly identical to the scheme the Defendants have perpetrated against Dr. Hantash here. Genie lost millions as has Dr. Hantash.

159.    Defendants have demonstrated a pattern of repeated attempts to intentionally defraud millions of dollars from multiple individuals and companies. Thus, the SBLC Syndicate extends beyond just the illegal actions against Dr. Hantash. Accordingly, Defendants unequivocally represent what can only amount to a coordinated criminal organization.

## CAUSES OF ACTION

### COUNT I: RICO – 18 U.S.C. § 1962(c)

160.    Plaintiff hereby incorporates by reference the allegations and causes of action contained in the preceding paragraphs of this Complaint as if fully set forth herein.

161.    This Count is against all Defendants.

162.    The SBLC Syndicate is an enterprise engaged in and whose activities affect interstate commerce. Defendants are employed by or associated with the SBLC Syndicate.

163.    Defendants agreed to and did conduct and participate in the conduct of the enterprise's affairs through a pattern of racketeering activity and for the unlawful purpose of intentionally defrauding Dr. Hantash. The Defendants fraudulently induced Dr. Hantash into transferring Four Million Dollars ($4,000,000) to the SBLC Syndicate. The Defendants misrepresented the status and liquidity of Dr. Hantash's property to deprive him of the same and profit therefrom.

164.    Pursuant to and in furtherance of their fraudulent scheme, the Defendants committed at least 65 related criminal acts as set forth above, which constitute racketeering activity pursuant to 18 U.S.C. § 1343 (relating to wire fraud).

165.    The 65 related criminal acts constitute a pattern of racketeering activity pursuant to 18 U.S.C. § 1961(5).

166.    The Defendants have directly and indirectly conducted and participated in the conduct of the enterprise's affairs through a pattern of racketeering activity described above, in violation of 18 U.S.C. 1962(c).

167.    As a direct and proximate result of the Defendants' racketeering activities and violations of 18 U.S.C. § 1962(c), Dr. Hantash has been injured through the theft of Four Million Dollars ($4,000,000).

168.    Dr. Hantash requests that this Court enter judgment against the Defendants awarding: (a) compensatory damages of $4,000,000 plus prejudgment interest at the statutory rate against Defendants jointly and severally; (b) consequential damages; (c) treble damages against Defendants jointly and severally; (d) attorneys' fees and costs pursuant to applicable law; and (e) all such further relief as this Court deems just and proper.

## COUNT II: RICO – 18 U.S.C. § 1962(d)

169.    Plaintiff hereby incorporates by reference the allegations and causes of action contained in the preceding paragraphs of this Complaint as if fully set forth herein.

170.    This Count is against all Defendants.

171.    As set forth above, Defendants agreed and conspired to violate 18 U.S.C. § 1962(c). Specifically, Defendants conspired to conduct and participate in the conduct of the affairs of the

SBLC Syndicate though a pattern of racketeering activity. The Defendants also conspired to conceal the conduct of the affairs of the SBLC Syndicate through a pattern of racketeering activity.

172.    Defendants knew that their predicate acts were part of a pattern of racketeering activity and agreed to the commission of those acts to further the schemes described above. That conduct constitutes a conspiracy to violate 18 U.S.C. § 1962(c), itself a violation of 18 U.S.C. § 1962(d).

173.    As a direct and proximate result of the Defendants' conspiracy, the overt acts taken in furtherance of that conspiracy, and violations of 18 U.S.C. § 1961 *et seq*., Dr. Hantash has been injured through the theft of Four Million Dollars ($4,000,000).

174.    Therefore, Dr. Hantash requests that this Court enter judgment against the Defendants awarding: (a) compensatory damages of $4,000,000 plus prejudgment interest at the statutory rate against Defendants jointly and severally; (b) consequential damages; (c) treble damages against Defendants jointly and severally; (d) attorneys' fees and costs pursuant to applicable law; and (e) all such further relief as this Court deems just and proper.

## COUNT III: COMMON LAW FRAUD

175.    Plaintiff hereby incorporates by reference the allegations and causes of action contained in the preceding paragraphs of this Complaint as if fully set forth herein.

176.    This Count is against all Defendants.

177.    As set forth above, Defendants, as individuals and acting by and through their respective principles, employes and agents, made material misrepresentations to Dr. Hantash as it concerned his investment of Four Million Dollars ($4,000,000) into the SBLC Syndicate's scheme including the validity of the investment, the terms of the investment as represented in the JV Agreement and elsewhere, the length of the investment, the profit-split of the investment, the return

on investment, and more. Defendants represented that they offered a safe and lucrative investment for Dr. Hantash.

178.    These material representations were false.

179.    At the time these representations were made, Defendants knew the representations were false and/or made these representations recklessly, as a positive assertion, and without knowledge of the truth. In doing so, Defendants intended that Dr. Hantash rely on these representations and act on them.

180.    Dr. Hantash reasonably relied on these representations in investing his Four Million Dollars ($4,000,000) in the SBLC Syndicate's investment scheme.

181.    Dr. Hantash was damaged by his reliance on Defendants' misrepresentations. Dr. Hantash was deprived of Four Million Dollars ($4,000,000) of his property without any possibility of return or profit because the SBLC Syndicate's investment scheme was fraudulent.

182.    In addition to the foregoing, each Defendant is vicariously liable for the fraudulent acts because they directly benefited from the fraudulent conduct identified herein and had knowledge of the fraud.

183.    Dr. Hantash requests that this Court enter judgment against the Defendants awarding: (a) compensatory damages of $4,000,000 plus prejudgment interest at the statutory rate against Defendants jointly and severally; (b) consequential damages; and (c) all such further relief as this Court deems just and proper.

## COUNT III: UNJUST ENRICHMENT

184.    Plaintiff hereby incorporates by reference the allegations and causes of action contained in the preceding paragraphs of this Complaint as if fully set forth herein.

185.    This Count is against all Defendants.

186.    As set forth above, Defendants set out a fraudulent investment scheme to induce Dr. Hantash to turn over Four Million Dollars ($4,000,000) to Defendants. Accordingly, Dr. Hantash, at his own expense, provided Defendants $4,000,000 as an investment.

187.    Defendants were enriched by virtue of Dr. Hantash providing Defendants with the Four Million Dollars ($4,000,000).

188.    As set forth above, Defendants obtained the benefit by fraud.

189.    For the reasons set out above, Defendants have been unjustly enriched, and it would by unjust to permit Defendants to retain the $4,000,000 that Dr. Hantash provided.

190.    As a result of Defendants acts and omissions directly resulting in Defendants' retension of the benefit and unjust enrichment, Dr. Hantash has suffered actual and significant injury. Defendants will be unjustly enriched if allowed to retain the benefit; therefore, Dr. Hantash is entitled to full restitution of the Four Million Dollars ($4,000,000).

191.    Therefore, Dr. Hantash requests that this Court enter judgment against the Defendants awarding: (a) compensatory damages of $4,000,000 plus prejudgment interest at the statutory rate against Defendants jointly and severally; (b) consequential damages; (c) attorneys' fees and costs pursuant TEX. CIV. PRAC. & REM. CODE § 38.001 *et seq*.; and (c) all such further relief as this Court deems just and proper.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays that that Defendants be cited to appear and answer, and that upon a final trial of this cause, Plaintiff recover appropriate relief or judgment against Defendants for:

(i)    actual damages;

(ii)    consequential damages;

(iii)    exemplary damages, including but not limited to, treble damages pursuant to 18 U.S.C. § 1964(c);

(iv)    pre-judgment and post-judgment interest at the maximum rate allowed by law;

(v)    reasonable and necessary attorneys' fees;

(vi)    costs of court; and

(vii)    such other relief, general and special, to which Plaintiff is entitled at law and/or in equity, and/or which the Court deems proper.

<u>**DEMAND FOR JURY TRIAL**</u>

Plaintiff demands a trial by jury on all issues that are so triable.

Dated: September 20, 2024

Respectfully submitted,

**CHAMPION LLP**

*/s/ Austin Champion*
Austin Champion
Texas Bar No. 24065030
Austin.Champion@championllp.com

Eugene M. Massad, III
Texas Bar No. 24126247
Eugene.Massad@championllp.com
----
2200 Ross Avenue
Suite 4500W
Dallas, Texas 75201
214-225-8880 | Main
214-238-8881 | Fax

and

**STOKLEY PLLC**

W. Craig Stokley
State Bar No. 24051392
cstokley@stokleypllc.com
----
8150 N. Central Expressway
Suite 550
Dallas, Texas 75206
Telephone: (214) 295-6414

**COUNSEL FOR PLAINTIFF
BASIL M. HANTASH**